No. 05-370C

1. (Judge Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ADRIAN RODRIGUEZ and ALI JAZMIN RODRIGUEZ

Plaintiffs,

v.

UNITED STATES OF AMERICA

Defendants.

---

TERESA TRUCCHI SBN# 135543
SUPPA, TRUCCHI, AND HENEIN, LLP
3055 India Street
San Diego, CA 92103
Telephone: (619) 297-7330
Telefax : (619) 297-9658

Attorneys for PLAINTIFFS
ADRIAN RODRIGUEZ and ALI JAZMIN RODRIGUEZ

TABLE OF CONTENTS Page no.


| | |
|---|---|
| I INTRODUCTION | 3 |
| II HISTORY OF PROCEEDINGS | 3 |
| III STATEMENT OF FACTS | 5 |
| IV STATEMENT OF SIMILAR CASES | 8 |
| CERVANTES V. USA | 8 |
| RIVERA, CALDERON v. USA ET. AL. | 9 |
| V. SOSA V. ALVAREZ MACHAIN | 11 |
| SUBJECT MATTER JURISDICTION | 12 |
| "AS-IS" PROVISION | 15 |
| VII CONCLUSION | 18 |

TABLE OF AUTHORITIES


| | |
|---|---|
| American Capital Corp. v. USA 66 Fed Cl. 315 | 14 |
| Betz v. USA 40 Fed. Cl. 286 | 13 |
| Bray v. USA 48 Fed. Cl 781 | 13 |
| Jose Cervantes v. United States 330 F.3d 1186 (9th Cir. 2003) | 8-9 |
| Faden v. USA 13 Cl. Ct. 328 | 13 |
| Franklin Savings Corp. v. USA 56 Fed.Cl 720 | 15 |
| Hatzlachh Supply Co. v. USA 444 U.S. 460 | 18 |
| Kania v. United States 227 Ct. Cl. 458 | 13 |
| Klamath Irrigation v. USA 67 Fed.Ct. 504 | 14 |
| Montana v. USA 124 F.3d 1269 | 14 |
| Pratt v. United States 50 Fed. Cl. 469 (2001) | 13, 16 |
| Solar Turbine v. USA 26 Cl.Ct.1249 | 16 |
| Sosa v. Alvarez-Machain 124 S.Ct. 2739 | 4-5, 11-12 |
| Sullivan v. USA 54 Fed.Cl. 214 | 14 |
| Summit Timber v. USA 230 Ct.Cl. 434 | 17 |
| Trudeau v. USA (2005) WL 2363043 | 13 |
| Zajanckauskas v. USA 346 F.Supp.2d. 251 | 13-14 |


STATUTES


| | |
|---|---|
| 28 U.S.C. 2680(k) | 4, 12 |

## INTRODUCTION

The present action arises out of the purchase of an automobile at a U.S. Customs Service seizure auction by plaintiffs ALI JAZMIN RODRIGUEZ and ADRIAN RODRIGUEZ and the subsequent incarceration of Plaintiff ADRIAN RODRIGUEZ in Mexico as a result of the discovery of marijuana in the vehicle by Mexican authorities in Tijuana. Plaintiffs contend that the marijuana was in the vehicle prior to their purchase but not removed by the U.S. Customs Service due to an intentional failure to conduct an adequate search of the vehicle.

Evidence is provided herewith (and discussed in detail below) showing that the USA officials' failure to conduct an adequate search was due to a San Ysidro Border Patrol policy to limit searches of seized vehicles in order to avoid causing damage that could diminish the resale value of the vehicle.

If necessary, plaintiffs request leave to amend the complaint to allege additional facts to establish the causes of action set forth in the complaint.

## HISTORY OF PROCEEDINGS

A complaint under the Federal Tort Claim Act was filed in the Southern District of California on April 30, 2004.

In June of 2004, the United States Supreme Court issued the ruling in Sosa v. Alvarez-Machain 124 S.Ct. 2739 (2004) finding that 28 U.S.C. 2680(k) barred any claim under the FTCA when the injury was suffered in a foreign country.

On December 7, 2004, the Honorable John Houston granted defendant USA's motion to dismiss the FTCA cause of action. Judge Houston found that the FTCA cause of action was barred under the decision in Sosa v. Alvarez-Machain 124 S.Ct. 2739 (2004) because Adrian Rodriguez (an American citizen who purchased the vehicle with his wife in San Diego, CA) was arrested in Tijuana. Judge Houston granted plaintiff's request for leave to amend to state causes of action under the Tucker Act. The parties then stipulated to transfer this matter to this court.

## STATEMENT OF FACTS

In the moving papers for this motion, and for the purposes of these motions, the USA accepted the allegations in plaintiffs' complaint. Plaintiffs' complaint alleges that on March 3, 2003, Ali Jazmin Rodriguez and Adrian Rodriguez (husband and wife) purchased a Volkswagen Passat at an auction conducted by EG&G/McCormick for the Department of Homeland Security of the UNITED STATES OF AMERICA [Complaint, paragraph 16].

On July 17, 2003, Adrian Rodriguez took the vehicle to a mechanic in Tijuana because it was making an unusual sound. The vehicle was found to have 33 pounds of marijuana in a box on the underside of the body. Upon discovery of the marijuana, Adrian Rodriguez asked the mechanic to call the police. The Tijuana police arrived and Adrian Rodriguez was arrested. [Complaint, paragraphs 17-18] Adrian Rodriguez was in Federal Prison in Mexico from and after July 17, 2003 until August 15, 2003 when he was released. [Complaint, paragraphs 17-22]

Plaintiffs contend that the area wherein the Mexican officials discovered the marijuana in July of 2003 had not been properly searched by CUSTOMS, MCCORMACK, or EG&G, INC. despite a duty to do so. [Complaint, paragraphs 22, 27, 31]

Plaintiffs contend that if the vehicle had been properly searched, the marijuana (in excess of 33 pounds) would have been detected. The failure to conduct a thorough search of the vehicle prior to sale was the

result of an USA policy to curtail searches in order to avoid causing damage to seized vehicles during customs' inspections. The goal of curtailing the searches was to maximize the resale value of the vehicle at auction. These contentions were confirmed by defendant USA's own witnesses (including the USA's designated expert) in sworn deposition testimony as set forth below:

JAYSON AHERN

"Q: Sir, who are you currently employed by?
A: I am employed by the Department of Homeland Security, specifically the Bureau of Customs and Border Protection as the Assistant Commissioner for the Office of Field Operations."
[Deposition of Jayson Ahern (6-4-04) pg. 5; ll. 7-11]

Q: Now, this memo makes the following statement ..... 'One, it is the responsibility of the seizing officer to ensure that a complete exam is done on the vehicle assigned to them.' Is that your understanding of what policy was in San Ysidro in November of 2000?
A: That would have been the policy guidance they received from the field director, Rudy Camacho, yes.
Q: So that's what the officers were expected to do as far as searching these vehicles; is that correct?
A: Yes."
[Deposition of Jayson Ahern (6-4-04) pg. 50; ll. 20-25; pg. 51, ll 1-11; Pl. App. 1]

ROBERT ROOT
"Q: .... you're supervisor in the canine enforcement department?
A: Yes, ma'am.
[Deposition of Robert Root (6-24-04) pg. 6; ll. 6-8; Pl. App. 2]

"Q: .... the first paragraph of this memo ... states: 'Prior to the sale of all conveyances seized and forfeited for the smuggling of controlled substances, a final canine screening or inspection must occur. This is to ensure that each conveyance sold is free of contraband.' Was that your understanding of the policy at the San Ysidro Port in 2001?
A: To the best of my knowledge."
[Deposition of Robert Root (6-24-04) pg. 30; ll. 2-8; Pl.App.2]

The fact that this duty was breached in this case was verified in depositions taken of the USA's designated expert David Murphy on June 25, 2004 as follows:

DAVID MURPHY
"Q: .... what is you occupation?
A: .... I'm the acting assistant director of field operations for the San Diego field office."
[Deposition of David Murphy (6-24-04) pg. 5; ll. 17-19; Pl. App. 3]

"Q: ... am I correct you've been asked to provide expert opinions in this case?
A: I've been designated as a federal employee with knowledge in this case on the standards of care, policies, and procedures for searching and inspecting seized and forfeited vehicles."
[Deposition of David Murphy (6-24-04) pg. 9;ll. 25; pg. 10;ll. 1-5; Pl.App. 3]
"Q: I am going to ask you a hypothetical question ... For the purposes of this question, please assume that there were approximately 37 pounds of marijuana still in this (vehicle) after Officer Marilao detected and removed some marijuana from the gas tank. .... In your opinion, if all of the search techniques that you described were performed on this vehicle in an adequate fashion, in your opinion, would they have detected an amount of drugs that was 37 pounds of marijuana?
[Objections omitted]
A: I would hope that they would.
Q: So in your opinion if those search techniques are performed adequately, an amount of that size, i.e., around 37 pounds, would be detected?
A: Yes."
[Deposition of David Murphy (6-24-04) pg. 43; ll. 21-25; pg. 44; ll. 1-18; Pl. App. 3]

The fact that the breach occurred in order to increase the financial gain received by the USA at the auction sale was verified in depositions of the USA agents as follows:

OFFICER JOSEPH MARILAO
"Q: ....What is your current employer?
A: United States Customs Border Protection"
[Deposition of Officer Joseph Marilao (6-9-04) pg. 6; ll. 23-24]

"Q: You're aware of an incident where inspectors were told in general (to avoid damage to the vehicles)?
A: Yes, ma'am
Q: And who -- how do you know about that? .....
A: That was briefed in general as far as when you're going through a vehicle to minimize the damage on them for resale purposes."
[Deposition of Officer Joseph Marilao (6-9-04) pg. 26; ll. 9-16]

"Q: When you say it was 'briefed in general,' who -- it was briefed by whom to whom?
A: I can't recall, but I know that it's been -- it's been said by other supervisors that you want to make -- minimize the damage for a vehicle for resale purposes, you know, as far as seizures go.
Q: Okay. And that was at San Ysidro?
A: Yes, Ma'am.
[Deposition of Officer Joseph Marilao (6-9-04) pg. 26; ll. 22-25 and pg. 27; ll. 1-4; Pl. App. 4]

ROBERT BICKERS
"Q: Who are you currently employed by?
A: Customs and Border protection."
[Deposition of Robert Bickers (6-9-04) pg. 6; ll. 21-22; Pl. App. 5]

"Q: .... What's your current position called?

A: I'm the antiterrorist contraband enforcement team supervisor."
[Deposition of Robert Bickers (6-9-04) pg. 8; ll. 10-12; Pl. App. 5]

"Q: ... Are you are of any requests or statements made to the inspectors at secondary (inspection) to try to avoid -- to minimize damage to the seized vehicle so they would have a higher resale value at auction? ..... Have you heard anybody discuss a suggestion such as that among the inspectors?
A: I've heard inspectors say it.
Q: What have you heard in that regard?
A: They don't want you to tear it up, but I correct them and direct them to do what they need to do."
[Deposition of Robert Bickers (6-9-04) pg. 26; ll. 3-17; Pl. App. 5]

The fact that this duty to search existed, and was breached by the USA, is further evidenced by Michael Levine, Plaintiff's expert on the standards and policies of USA customs department. As set forth in the report of Mr. Levine, USA is required under its policies and procedures to search any automobile when there is probable cause to suspect narcotics to be hidden within the vehicle, and that the USA's search of the automobile was "significantly substandard and incomplete." [Dec of Trucchi, Pl. App. 6].

STATEMENT OF SIMILAR CASES

The issue of whether or not these parties have a right to sue the USA under this general fact pattern was examined by the Ninth Circuit Court of Appeals in another similar case entitled Jose Cervantes v. USA [United States District Court Number 01CV0128K(LSP)].

CERVANTES V. USA

In 1999, 67 year old Jose Cervantes was arrested by US Custom officials as he waited in line at the border crossing at Otay Mesa, CA to deliver a passport to his grandson (who was on a field trip to the USA). Mr. Cervantes stayed in jail in from October 22, 1999 until his release on February 9, 2000. [Cervantes v. USA 330 F.3d 1186 (9th Cir. 2003)]

Mr. Cervantes purchased the vehicle he was driving at the time of his arrest from the USA at a USA custom forfeiture seizure sale. The marijuana found in his car was eventually determined to have been left in the vehicle at the time of the sale. [Cervantes v. USA, supra at 1188]

The USA moved to dismiss the complaint based, in part, on the "detention of goods" exception to the FTCA found at 28 USC 2860(c). The motion to dismiss was granted by the trial court.

On June 2, 2003, the 9th Circuit Court of Appeal reversed in a published opinion that states:

"In asserting the detention of goods exception as its defense, rather than compensating a plaintiff it has seriously wronged, the United States thumbs its nose at its obligation to see that justice is done. The Supreme Court long ago pronounced the special obligation of the United States Attorney to serve the interests of justice:

'The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligations to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done ...[He] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.' [citing Berger v. United States 295 U.S. 78, 88 (1935)] ' In asserting a last-ditch, far-fetched defense in this case, the United States Attorney failed to meet this obligation. We trust that this is but a momentary lapse."

[Cervantes, supra, 1190-1191]

RIVERA, CALDERON v. USA ET. AL.

There is another similar case pending in this court in front of the Honorable Judge Hewitt. The complaint in Rivera, Calderon v. USA (United States Court of Federal Claims Number 05-608C)][see; also, Declaration of Francisco Rivera, Pl. App. 9 and Declaration of Alfonso Calderon, Pl. App. 10] alleges as follows:

RIVERA and CALDERON LEON are citizens of the Country of Mexico and authorized to enter the United States to conduct business. [Cmp. para. 2-3] Jose Armando Jimenez Coronel purchased and thereafter imported a 1987 Nissan Pathfinder VIN:JN8HD16Y7HW029972 (hereinafter SUBJECT VEHICLE) into Mexico on December 12, 2000. On or about January 25, 2001, Mr. Jimenez was arrested and the SUBJECT VEHICLE was seized by USA under 18USC545; 21 USC952; and 19CFR162.45(A)(for transportation of marijuana across the United States border.) [Cmp. para 10-11]

On January 30, 2001, Mr. Jimenez pled guilty to violation of California Health and Safety Code §11359 and admitted that he "knowingly possessed 59 pounds of marijuana for purposes of sale." [Cmp. para. 12] On February 20, 2001, Mr. Jimenez was granted probation for three (3) years, sentenced to time served (39 days) and ordered to pay $400.00 in fines and restitution. In exchange, the balance of the charges against him were dismissed. [Cmp. para. 13]

Thereafter the SUBJECT VEHICLE was made available for sale to the public through a Federal Forfeiture Sale. On September 5, 2001, RIVERA acquired the SUBJECT VEHICLE from the Department of Treasury in a Public Auction following a Customs Service Department Federal Forfeiture Sale. [Cmp. para. 15]

On Thursday, January 24, 2002 RIVERA was traveling in the SUBJECT VEHICLE from the City of Ensenada, Baja California to the City of Tijuana, Baja California. RIVERA was accompanied by CALDERON. RIVERA and CALDERON were stopped at a Highway Check Point at the location known as El Sauzal, Ensenada, Baja California by Mexican authorities. [Cmp para. 16]
The SUBJECT VEHICLE was searched. The Mexican authorities discovered twenty two (22) packages containing marijuana (weighing 17 kilograms total.) The packages were between the upholstery walls and the body of the vehicle (the wheel well.) [Cmp. para. 17]

RIVERA and CALDERON were arrested and were in Federal Prison in Mexico from and after January 24, 2002 [Cmp. para. 18] until their release on January 10, 2003 (upon a finding of innocence).

Jose Blanco Loya, an expert witness from the Office of the Attorney General (in Mexico), tested the marijuana on January 25, 2002. On February 13, 2002, Mr. Blanco testified before the 11th Federal District Court of Ensenada that the marijuana found by the Mexican authorities on January 24, 2002 was "highly dehydrated, consistency and texture had been lost, and due to color lost, it had a 'brownie' color trend .... change in texture and consistency is also due to they (sic) have been stored or exposed to certain physical or atmospherical conditions, change in color is due to an old or stored marijuana ...." [Cmp. para. 19]

On March 11, 2002, expert chemists Rafael Garcia Gutierrez and Miguel Carrillo Mendivil, qualified as experts in the Federal Court, testified as follows: "(the marijuana) is highly dehydrated, it has a brownie color ... it is observable that is marijuana that has been stored for a long time and not only that, at opening a 'rotten' odor comes from the packages.... it is assumed that such illegal drug was exposed to adverse atmospherical and physical conditions for a long time." [Cmp. para. 20]

Thereafter, in a response to a Freedom of Information Act request filed by plaintiffs' counsel, photographs were produced by CUSTOMS showing that the area wherein the Mexican officials discovered the marijuana in January of 2002 had not been searched by USA prior to the sale to RIVERA. [Cmp. para. 21][see; also, Declaration of Francisco Rivera, Pl. App. 9 and Declaration of Alfonso Calderon, Pl. App. 10]

SOSA v. ALVAREZ MACHAIN

Currently, the instant case (RODRIGUEZ) and the RIVERA/CALDERON cases are pending in the United States Court of Federal Claims while the CERVANTES case remains in the Southern District Court of California. To explain why this has occurred, it is necessary to briefly address the Supreme Court ruling in the case Sosa v. Alvarez-Machain (2004) 124 S. Ct. 2739.

Dr. Alvarez Machain was alleged to be an accomplice to a torturer working for a drug trafficker in Mexico. Dr. Alvarez Machain was accused of using his medical skills to keep DEA agent Enrique Camarena alive for as long as possible in order to subject Agent Camarena to further torture before he died. [Sosa v. Alvarez-Machain at pages 2746-2750]

In the case of Sosa v. Alvarez Machain, some DEA agents working for the USA became concerned that Mexico would not complete the extradition process and bring Dr. Alvarez-Machain to justice for his

alleged acts. In order to circumvent the extradition process altogether, these USA DEA agents hired a couple of Mexican nationals to kidnap Dr. Alvarez-Machain (a Mexican citizen residing in Mexico) and put him on a private plane bound for El Paso, Texas. The Mexican nationals complied with the wishes of the USA DEA agents and Dr. Alvarez-Machain was kidnaped from his home in Mexico, held overnight in a motel in Mexico, flown to El Paso, Texas the next day and eventually brought to trial in the United States. [Sosa v. Alvarez-Machain at pages 2746-2750]

Dr. Alvarez-Machain moved to dismiss the criminal case based upon the illegality of his forcible seizure in Mexico. The District Court and the 9th Circuit Court of Appeals agreed with Dr. Alvarez-Machain. The United States Supreme Court disagreed and reversed finding that the fact of Alvarez-Machain's "forcible seizure did not affect the jurisdiction of a federal court". [Sosa v. Alvarez-Machain at page 2746-2750]

The criminal case was tried in 1992, and ended at the close of the Government's case, when the District Court granted Alvarez's motion for a judgment of acquittal. [Sosa v. Alvarez-Machain at page 2750] Thereafter, Dr. Alvarez-Machain sued the individuals that kidnaped him (one of whom was appellant Jose Francisco Sosa) and the United States of America for his kidnaping and one night detention in a motel in Mexico. [Sosa v. Alvarez-Machain at page 2750]

The United States filed a motion to dismiss based upon the foreign country exception to the Federal Torts Claim act. [28 U.S.C. 2680(k)] The foreign country exception to the Federal Torts Claims Act [28 U.S.C. 2680(k)] states that it bars all claims involving an injury "arising in" a foreign country.

The Alvarez-Machain decision involved an analysis of the "headquarter doctrine". [Sosa v. Alvarez-Machain at page 2748-2749] This doctrine was developed in case law and essentially provided that the foreign county exception to the Federal Torts Claim Act found at 28 U.S.C. 2680(k) did not bar a suit against the USA if the "negligent act or omission" leading to the injury occurred in the United States. [Sosa v. Alvarez-Machain at page 2750] The "headquarter doctrine" was primarily developed in cases involving a situation where USA agents, while physically located in their office in the USA, plotted some sort of tort that they wanted to commit in a foreign country.

On June 29, 2004, the United States Supreme Court dismissed Dr. Alvarez-Machain's civil suit against the United States of America rejecting the "headquarters doctrine" and finding that because the injury to Dr. Alvarez was "suffered in a foreign country", it was barred. [Sosa v. Alvarez-Machain at page 2750] In Alvarez-Machain, the Supreme Court found that the "injury" alleged in the civil suit was the kidnaping and one night detention in Mexico. The only act occurring on U.S. soil was the USA DEA agents' decision to hire the Mexican kidnappers -- a classic "headquarters doctrine" argument. [Sosa v. Alvarez-Machain at page 2750]

While analyzing the viability of the "headquarters doctrine" in the Alvarez-Machain case, the Supreme Court interpreted the phrase "arising in" to mean "suffered in a foreign country". The Alvarez-Machain decision rejected the "headquarters doctrine" by holding that the foreign country exception applies when the injury is suffered in a foreign country regardless of where the tortuous act or omission occurred. [Sosa v. Alvarez-Machain at page 2750]

It is because of this ruling that the case of Jose Cervantes (a Mexican citizen living in Tijuana) can sue the USA under the FTCA while RODRIGUEZ (a United States citizen) and RIVERA/CALDERON (Mexican nationals) have been forced to pursue their request for a remedy through the Tucker Act.

SUBJECT MATTER JURISDICTION

Defendant, the UNITED STATES OF AMERICA ("USA") brings the present motion on the grounds that there is no triable issue of material fact as to whether or not the plaintiffs can state a cause of action over

which the United States Court of Federal Claims has subject matter jurisdiction. The USA contends that the causes of action contained in the complaint are torts and do not arise out of a contract (express or implied).

In support of this contention, USA cites a variety of cases that do not involve business transactions at all -- criminal cases such as Kania v. United States 227 Ct. Cl. 458, 650 F2d 264, 269 (Ct. Cl. 1981), a military pay case entitled Bray v. USA 48 Fed. Cl 781, 783-84 (2001); an imminent domain case entitled Faden v. USA 13 Cl. Ct. 328, 335 (1978) and tax liens cases such as Betz v. USA 40 Fed. Cl. 286, 291 (Fed. Cl. 1998) and Pratt v. United States 50 Fed. Cl. 469 (2001).

The USA's reliance upon the Pratt, id. case is interesting because in Pratt, Id., at pg. 478 and FN6, the Court found that the plaintiff could state a cause of action for breach of contract; breach of the implied covenant of good faith, id., at 479-480; and was entitled to seek reimbursement of attorney fees as damages, id., at 482-483.

The Pratt court further stated: "A claim for tortuous breach of contract, in contrast, is not a tort independent of the contract so as to preclude Tucker Act jurisdiction (citations omitted). This is true regardless of whether the loss resulted from the negligent manner in which the government performed the contract (citations omitted) although it is not enough that the conduct is merely related in some general sense to the contractual relationship of the parties (citations omitted) For jurisdictional purposes, the tortuous conduct must specifically relate to a contractual obligation." [Pratt v. USA 50 Fed.Cl. 469, 480-481]

In Pratt, the court ultimately found that there was no connection between the USA's conduct during subsequent litigation and the contractual obligation initially owed to plaintiff. This is not the case in the instant matter. In the instant matter, the obligation to search the vehicles in a reasonable fashion was an integral component of the contract for sale to the plaintiffs as well as the contract between the USA and EG&G to conduct the seizure sales.

The USA's reliance on Kania v. USA , supra, 227 Ct. Cl. 458 is misplaced in light of the fact that Kania involved a criminal action and the USA was acting in its sovereign capacity. In Trudeau v. USA (2005) WL 2363043 (Fed. Cl.) the Court discussed Kania and cited with approval the language in Kania that distinguishes a situation where the USA is acting as a sovereign (as in Kania) as opposed to a proprietary capacity (as in the instant case).

In Zajanckauskas v. USA 346 F.Supp.2d. 251 the Court took a different approach and concluded that the difference between a criminal action (such as Kania) and a civil action (such as the instant matter) was critical in determining whether or not a contract claim was "cognizable under the Tucker Acts as a matter of course (civil) and those cognizable only if they contain a clear and unmistakable statement subjecting the Untied States to monetary liability for any breach (criminal)." [Zajanckauskas Id., at 257]

None of the cases cited by the USA involved a fact pattern similar to the fact pattern involved in this case. The case that is on point factually with the instant matter is entitled Sullivan v. USA 54 Fed.Cl. 214 (2002). In Sullivan, id., the plaintiff was injured in a vehicular accident caused by a government contractor and sued the USA alleging that she was a third party beneficiary of contractual provisions which required the contractor to possess vehicle insurance. As this agreement was breached, she was entitled to damages in the amount of $750,000 for her personal injuries from the USA on a breach of contract cause of action.

Adrian Rodriguez is arguably a party to the contract due to his status as a spouse in a community property state However, as set forth in Sullivan, Id. and other cases (discussed below), it is not required that the plaintiffs be a party to the contract as long as the plaintiffs are proper third party beneficiaries of the contract(s) at issue. Plaintiffs were allowed to pursue claims as third party beneficiaries in the following cases: American Capital Corp. v. USA 66 Fed Cl. 315, 341 (2005) (third party beneficiary of a forbearance agreement) and Klamath Irrigation v. USA 67 Fed.Ct. 504, 532-535.

Klamath Irrigation, id., is particularly interesting as plaintiffs were members of the general public who stood to benefit from drainage agreements involving the USA and third parties. In the present case, the USA had a contractual agreement with EG&G, Inc. to conduct these seizure sales. The pre-sale search was obviously for the benefit of the ultimate purchaser as there would be no other purpose (except to protect the purchaser) for an additional search after the vehicle had already been forfeited.

"The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefitted thereby (citing Montana v. USA 124 F.3d 1269, 1273 (1997)." Klamath Irrigation v. USA 67 Fed. Ct. at 533

Similarly, in this case, plaintiffs allege that they were the third party beneficiaries of the contractual obligation and regulatory duty to conduct a thorough search of seized vehicles before selling the same to plaintiffs. The obligation to conduct a thorough search of the vehicle was breached. The breach occurred for the express purpose of increasing the USA's gain in the subsequent commercial transaction with plaintiffs. The USA did not notify potential purchasers that the vehicles had not been thoroughly searched as part of the seizure and sale preparations. This lack of disclosure increased the value of the vehicles for the USA (as the vehicles were not damaged by the search) to the detriment of the purchaser (who were not aware that the reason for the marketable state of the vehicle was an inadequate search for contraband). There is a triable issue of material fact as to whether or not this conduct rises to the level required under Franklin Savings Corp. v. USA 56 Fed.Cl. 720, 746 (2003) to support a claim for violation of the covenant of good faith and fair dealing by the USA.

The damages sustained are also foreseeable. The purpose of searching the vehicle before a sale to the general public is obviously to ensure that the vehicle is not released into the stream of commerce to an unwitting purchaser while it is still full of a substantial amount of drugs. The only foreseeable harm that would come to the purchaser should the vehicle not be searched would be detention and arrest by the authorities if the drugs are thereafter discovered. It is very foreseeable that these vehicles will be driven to Mexico. In fact, in each case discussed above, Mexico was involved: the first case, Cervantes, the vehicle was sold to a Mexican National and he was arrested when he tried to come back into the USA. The second case, Rivera and Calderon, the vehicle was again sold to a Mexican National and both of the parties were arrested and imprisoned in Mexico. It is common for individuals living near the Tijuana border to take vehicles to Tijuana for repairs (as the price is much lower than San Diego). [Dec. of Adrian Rodriguez, Pl. App. 8] It is foreseeable that a person will drive around in a vehicle that he or she purchased in one of these auctions. As such, it is not reasonable to conclude that it is not foreseeable that the purchaser of a vehicle at an auction near the border will be arrested in Mexico.

As a triable issue of material fact exists as to all of these issues, the plaintiffs should be entitled to a trial on the merits of this action .

"AS-IS" PROVISION

The UNITED STATES argues that it's one-page, unsigned "Notice to Potential Bidder" creates an "as-is" contract with Plaintiffs that binds them to accept the Volkswagen with 37 pounds of marijuana hidden inside and bars Plaintiffs from recovery in the present action. This argument is not supported by law or fact. In the first place, there is a triable issue of material fact as to whether or not the plaintiffs ever saw the disclaimer or were even aware of any such disclaimer at the time of the sale [Pl. App. 7 and 8]

Further, an "as is" provision does not relieve a seller of all responsibility of disclosure. Instead, it is a factor to be considered with all other circumstances in determining whether the buyer has been misled or the seller is in breach. The Pratt v. USA 50 Fed.Cl. 469, 479 court found that the mere existence of a risk of loss disclaimer does not excuse the Government from the implied obligation to act in good faith and to deal with purchasers fairly.

In the case of Solar Turbine v. USA 26 Cl.Ct. 1249, 1273 the court discussed Section 2-313 of the Uniform Comerica Code and found that an affirmation of fact can create a warranty where the affirmation is "part of the basis of the bargain" in that it was made in the course of negotiating the agreement.

There is a triable issue of material fact in this case as to whether or not the fact that these sales were presented as US forfeiture sales created an affirmation of fact that would lead the reasonable purchaser to believe that the vehicles had been adequately searched prior to the sale (or at least that the search was not intentionally limited to increase the USA's profits).

Plaintiffs were reasonable to presume that the USA performed a proper search of the vehicle as this was required by its own policies and procedures.

As admitted by the USA expert, David Murphy, if the search had been adequate, an amount equal to 37 pounds would have been detected:

Q: So in your opinion if those search techniques are performed adequately, an amount of that size, i.e., around 37 pounds, would be detected?
A: Yes."
[Deposition of David Murphy (6-24-04) pg. 43; ll. 21-25; pg. 44; ll. 1-18; App. 3]

.
Furthermore, a careful reading of the Notice indicates that it address warranties of title, identity, physical condition and registration status. Nowhere does it advise the buyer that these vehicles could still have significant amounts of narcotics hidden within them, and that the purchase knowingly agrees to accept the vehicle despite this fact. This was not communicated to J. RODRIGUEZ, A. RODRIGUEZ, RIVERA or CALDERON. [Dec. of J. RODRIGUEZ, Pl. App. 7; Dec. of A. Rodriguez, Pl. App. 8; Dec. of RIVERA, para. 13-16, Pl. App. 9; Dec. of CALDERON, para. 12-15, Pl. App. 10] at the time of the sale

The Pratt v. USA case (supra, 50 Fed. Cl. 469 at 481) provides further support for the finding that there is a triable issue of material fact in this case as to the scope of the "as-is" provision in the unsigned brochure:

"Defendant cites no authority for the proposition that the existence of disclaimers precludes a party from making affirmative misrepresentations. As with the breach of contract claim, the issue here is whether any alleged misrepresentations fell within the scope of the disclaimers ... [The contract] contained positive, but erroneous representations upon which plaintiff in fact relied ... That those erroneous "positive representations" were that defendant had taken certain actions prior to contract formation (parenthetically, a not unusual situation) is plainly no defense to an action for breach of contract based upon misrepresentation (citing Summit Timber v. USA 230 Ct. Cl. 434 at 440-41)"

In the present case, despite the language in the Notice that the vehicles are sold "as-is where is," this is actually not the case: the UNITED STATES has in fact implemented policies and procedures for searching the vehicles and failed to follow them, which is not within its discretionary function. The United States Supreme Court has repeatedly scrutinized the exercise of the United States discretionary function, and finds that while United States' enactment of a policy or procedure may have been discretionary, its performance under that act is not.

In the deposition testimony of Jayson Ahern, set forth above, Mr. Ahern testified that USA is required by its rules and regulations to perform a complete and thorough search of the vehicle. Further, the "as-is where is" warranty is clearly meant to refer to the mechanical condition of the vehicles and issues related to title. A warranty in this situation would not relieve the USA Border patrol officials from their mandatory duty to conduct a thorough inspection on the vehicle before it was released to the general public in an auction sale.

The USA had a policy to conduct searches for the purposes of ensuring that the vehicles were reasonably clear of contraband before they were sold. A purchaser at a USA seizure sale would be reasonable if he or she were to presume that the vehicle had been completely inspected. This belief is reasonable because of the representation that this is a USA forfeiture sale. When the USA then decided to limit searches for the purpose of increasing resale value of the vehicle, but did not disclose this policy to the purchaser, a material misrepresentation of an implied-in-fact term of the contract occurred. There is a triable issue of fact as to whether or not the post-secondary searches were for the purpose of protecting Plaintiffs from harm that would be suffered if a large quantity of narcotics remained in the seized vehicles at the time of sale.

Accordingly, once the USA's policies and procedures for conducting searches of seized vehicles was determined, it was the USA's responsibility to see that they were followed with "constant vigilance." As seen by the deposition testimony above, there was a determination by the officials in charge of conducting the searches to abandon those procedures in favor of a policy that placed maximizing profits over the safety of the individuals purchasing the seized vehicles.

As such, the "as-is" provision cannot be construed as a knowing waiver of any claim for damages arising out of hidden narcotics in the vehicle, particularly when there is no evidence that Plaintiffs saw, agreed or signed the Notice. Accordingly, as an issue of fact exists regarding the nature and scope of the as-is provision, summary judgment should be denied.

As to the claim for warranty and a contract implied in fact, in the US Supreme Court case entitled Hatzlachh Supply Co. v. USA 444 U.S. 460, 465 the Court found that the absence of Government tort liability has not been thought to bar contractual remedies on implied-in-fact contracts, even in those cases also having elements of a tort: "Without more, neither the existence of a tort remedy nor the lack of one is relevant to determining whether there is an implied-in fact contract ..."

VI
CONCLUSION

For the reasons stated above, plaintiffs respectfully request that the defendant's motion to dismiss or, in the alternative, for summary judgment be denied. In the alternative, plaintiffs respectfully request leave to amend their complaint to the extent the factual allegations are deemed insufficient to support any of the requests for relief contained therein.

DATED: October 28, 2005 SUPPA, TRUCCHI & HENEIN, LLP

By: TERESA TRUCCHI,
Attorneys for Plaintiffs